753 F.2d 575
 Medicare&Medicaid Gu 34,492
 In the Matter of SPECIAL MARCH 1981 GRAND JURY.
Appeal of ALMOND PHARMACY, INC., et al.
 
 No. 84-1187.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 11, 1984.
Decided Jan. 23, 1985.
 Daniel A. DuPre, Asst. U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill., for plaintiff.
 Edgar A. Blumenfeld, Edgar A. Blumenfeld, Ltd., Chicago, Ill., for defendant.
 Before POSNER, Circuit Judge, SWYGERT, Senior Circuit Judge, and DUPREE, Senior District Judge.*
 POSNER, Circuit Judge.
 
 
 1
 This appeal questions the propriety of the action of the Chief Judge of the Northern District of Illinois in handing over to the Illinois Department of Public Aid voluminous business records of the appellants (several pharmacies) that a federal grand jury had subpoenaed in 1983. The appellants had turned over the records to the grand jury without making copies of them; and when shortly afterward the Department of Public Aid tried to audit the appellants as part of its responsibility for administering Medicaid, the appellants told the Department that the records it needed were in the hands of the grand jury. The state thereupon (in August 1983) wrote one of the assistant United States attorneys in charge of the grand jury's investigation, listing the categories of documents it needed and requesting access to them. Satisfied (without going much behind the letter) with the state's representation that the records it was seeking were indeed ones that federal and state law required the appellants to maintain, the assistant U.S. attorney filed in September and October ex parte motions with the chief judge of the district court, which were promptly granted, to allow the United States Attorney's office to hand over the requested documents to the state. In January 1984 the appellants, discovering that their records were in the hands of the state (where they remain today), which was using them in administrative proceedings that might result in terminating their eligibility to participate in the Medicaid program, petitioned the chief judge to prohibit the state from using the records in any judicial or administrative proceeding, and to prohibit access to the records by anyone else. The chief judge denied the petition and this appeal followed. The grand jury has since been dismissed, having indicted several individuals whose connection, if any, with the appellants, all of which are corporations, is obscure.
 
 
 2
 The United States Attorney, who is defending the chief judge's order in this court, argues that these pharmacies do not have standing to contest the order, because the State of Illinois has an absolute right under federal and state law to see their business records, and the pharmacies therefore were not harmed by the order. See 42 C.F.R. Secs. 455.104-455.106; Ill.Rev.Stat.1981, ch. 23, p 5-5; Ill.Dept.Pub. Aid R. 4.014. If they were not harmed, their petition is not within the power of the federal courts to grant. See, e.g., People Organized for Welfare & Employment Rights v. Thompson, 727 F.2d 167, 169 (7th Cir.1984). But the petition claims that the district court violated state and federal law in releasing the appellants' business records to the state. The claim may be right or wrong but that is an issue on the merits and is irrelevant to standing. What is relevant is that the appellants are being hurt by the release because the state is busy using their records against them. See Douglas Oil Co. v. Petrol Stops Northwest, 441 U.S. 211, 218 n. 8, 99 S.Ct. 1667, 1672 n. 8, 60 L.Ed.2d 156 (1979).
 
 
 3
 Even so, it is not immediately obvious what they have to gain from winning this appeal. The cat has been out of the bag for a year. The state has had all that time to go through the records, copy them, and use them. What good would it do the appellants to get the records back now? They do not claim to need them for their business. They only want to keep them away from the state, and it seems too late for that. It is not enough, to give you standing, that you have been hurt by someone; you must have something tangible to gain from your suit--some alleviation of, or compensation for, the hurt. Otherwise the suit is as much an academic exercise as if it were brought to prevent a nonexistent harm. See, e.g., Valley Forge Christian College v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982).
 
 
 4
 But the appellants want an order preventing the state from making any use of the documents, and if such an order would be within the district court's power, the appellants do have something concrete to gain from winning this appeal. Rule 6(e) of the Federal Rules of Criminal Procedure creates a procedure by which a federal court can order the disclosure of matters occurring before the grand jury. If the court orders such disclosure erroneously, we suppose both that an injured person can complain by filing (as was done here) a petition with the court that ordered disclosure and that the court has inherent power to issue an appropriate curative order, including an order preventing the person to whom disclosure was erroneously made from using the information gained from it. See In re Grand Jury Investigation No. 78-184, 642 F.2d 1184, 1188 (9th Cir.1981), aff'd under the name of United States v. Sells Engineering, Inc., 463 U.S. 418, 103 S.Ct. 3133, 77 L.Ed.2d 743 (1983); cf. Gumbel v. Pitkin, 124 U.S. 131, 144, 8 S.Ct. 379, 383, 31 L.Ed. 374 (1888); Handler v. SEC, 610 F.2d 656, 659 (9th Cir.1979); 1 Moore's Federal Practice p 0.60, at p. 634 (2d ed. 1984). We do not think Congress meant to leave the courts powerless to correct such errors. So if the appellants are right that the district court erred in turning over their records to the state, they may be able to obtain a remedial order. This is possibility enough to confer standing, and we can turn to the merits, where two issues require discussion.
 
 
 5
 The first is whether the appellants' records are (or were) "matters occurring before the grand jury." Rule 6(e)(2) forbids "an attorney for the government" (among others) to disclose such matters, with limited exceptions (set forth in Rule 6(e)(3)) that the State of Illinois, in requesting the assistance of the United States Attorney, made no effort to fit itself within. Thus, if the appellants' records were "matters occurring before the grand jury," the district court erred in letting the state have them. In a literal sense they were matters occurring before the grand jury. But because the exceptions in Rule 6(e) to maintaining grand jury secrecy are so limited, a literal reading would have most unfortunate practical consequences, and is also unnecessary for the protection of that secrecy. The principle has therefore emerged that "matters occurring before the grand jury" do not include every document of which the grand jury happens to have custody. If a document is sought for its own sake rather than to learn what took place before the grand jury, and if its release will not seriously compromise the secrecy of the grand jury's deliberations, Rule 6(e) does not forbid its release. See, e.g., In re Grand Jury Proceedings, Miller Brewing Co., 687 F.2d 1079, 1089-90 (7th Cir.1982); In re Special February 1975 Grand Jury, 662 F.2d 1232, 1244 (7th Cir.1981) (supplemental opinion), aff'd under the name of United States v. Baggot, 463 U.S. 476, 103 S.Ct. 3164, 77 L.Ed.2d 785 (1983); United States v. Stanford, 589 F.2d 285, 291 (7th Cir.1978); United States v. Interstate Dress Carriers, Inc., 280 F.2d 52, 54 (2d Cir.1960).
 
 
 6
 Illinois needs the appellants' business records to determine the appellants' eligibility to participate in the Medicaid program. But if the appellants are right in their reading of Rule 6(e)(2), then by the simple expedient of not making copies of the records that they turned over to the grand jury in response to its subpoena they have succeeded in putting the records into perpetual cold storage. We are exaggerating, but only a little. The state might be able to make a "strong showing" of a "particularized need" for the records in connection with anticipated judicial proceedings against the appellants, and so come within the exception to grand jury secrecy in Rule 6(e)(3)(C)(i), as judicially glossed, for example in Lucas v. Turner, 725 F.2d 1095, 1101 (7th Cir.1984). Or it could forget about the records and terminate the appellants' participation in the Medicaid program because of their failure to maintain required records. See Ill.Rev.Stat.1981, ch. 23, p 12-4.25(A)(b). (Of course the appellants would fight this tooth and claw--are fighting tooth and claw, we infer, in the termination proceedings that the state has brought against them.) But these measures seem unduly cumbersome (as well as possibly ineffectual), given that--as we are about to see--releasing the records could not have compromised the secrecy of the grand jury to any appreciable extent.
 
 
 7
 Judge Friendly's compact summary of the interests that grand jury secrecy protects--"the interest of the government against disclosure of its investigation of crime which may forewarn the intended objects of its inquiry or inhibit future witnesses from speaking freely; the interest of a witness against the disclosure of testimony of others which he has had no opportunity to cross-examine or rebut, or of his own testimony on matters which may be irrelevant or where he may have been subjected to prosecutorial brow-beating without the protection of counsel; the similar interests of other persons who may have been unfavorably mentioned by grand jury witnesses or in questions of the prosecutor; protection of witnesses against reprisal; and the interests and protection of the grand jurors themselves," In re Biaggi, 478 F.2d 489, 491-92 (2d Cir.1973) (footnote omitted)--includes two distinct types of interest: the institutional and the personal. The institutional interests, which range from not forewarning the targets of the grand jury's investigation to protecting witnesses and grand jurors from reprisals, are those that are important to the grand jury's investigatory effectiveness. The personal are private interests, mainly in reputation, that the ex parte nature of the grand jury puts at risk: for example, the reputation of a person accused of wrongdoing by a witness before the grand jury.
 
 
 8
 The Justice Department should be an adequate guardian of the institutional interests of (federal) grand juries--after all, the grand jury is an investigatory tool of the Department. And far from opposing the state's request, the Justice Department through the local U.S. Attorney made the request on the state's behalf and defends the request in this court. In fact the request posed no threat to the grand jury's institutional interests. Although a list of the documents subpoenaed by a grand jury could be used to infer the nature and maybe the direction of its investigation, with the possible consequences of forewarning targets of the investigation and exposing witnesses and grand jurors to reprisals, the state was not asking for a list of the records that the appellants had given the grand jury. It knew already--the appellants had told it--that the records it wanted were among those the grand jury had subpoenaed. The only information that the documents themselves could reveal to the state about the grand jury's deliberations was what could be learned about those deliberations by actually reading the documents, as distinct from the information the state already possessed by virtue just of knowing that the grand jury had subpoenaed the documents. Especially as most of the documents were either medical or financial records--prescription receipts or ledger sheets--the additional information must have been slight.
 
 
 9
 Nor did the state's request pose a threat to the personal interests that the policy of grand jury secrecy protects. Although the interest in protecting the reputations of persons whose names may be mentioned in the grand jury's deliberations yet who may never be criminally prosecuted could be affected by releasing documents that had been submitted to the grand jury and contained accusatory matter, the appellants' records are not of such character. They are not narratives, but records of transactions; they contain no defamatory or embarrassing material.
 
 
 10
 To summarize, the harm to the interests in keeping grand jury proceedings secret is too slight, compared to the harm to the state of not being able to see the appellants' records, to warrant classifying these records as "matters occurring before the grand jury"; so their release violated no substantive restriction in Rule 6(c).
 
 
 11
 But we must still consider the appellants' argument that release should not have been ordered in a proceeding of which they had no knowledge. There is great force to this argument in a case such as this where the request is not by (or on behalf of) the owner of the items requested. It is true that Rule 6(e)(3)(D) allows the court to proceed ex parte when the federal government petitions for disclosure of matters occurring before the grand jury for use in connection with a judicial proceeding. But the fact that they are matters occurring before the grand jury means, as made clear by the Advisory Committee's Note to the 1983 amendment to Rule 6 (the amendment that added Rule 6(e)(3)(D) ), that ex parte procedure may be necessary to preserve the secrecy of the grand jury proceeding. The Note also makes clear that whether ex parte procedure is proper, even in such a case, depends on the circumstances--and that it is "much less likely to be appropriate if the government acts as petitioner as an accommodation to, e.g., a state agency."
 
 
 12
 Although Rule 6 establishes no procedure for determining whether and to whom documents or other materials in the grand jury's custody that as in this case are not matters occurring before the grand jury should be released, we think it implicit in the rule, in the inherent character of a judicial system, and most clearly in the due process clause of the Fifth Amendment that a federal court in disposing of property in its control must follow reasonable procedures for the protection of the owner's interests. With power comes responsibility. Suppose a diamond ring was stolen and later recovered from the thief and deposited in court as an exhibit in his trial. And suppose that after the trial was over someone wrote the clerk of court asking for the ring and the clerk turned it over to him without so much as consulting the owner. The owner would have been deprived of his property without due process of law.
 
 
 13
 The same principle applies, if less dramatically than in our hypothetical example, to this case. The appellants' business records, though submitted to the grand jury in response to its subpoenas, remained their property, see United States v. Penrod, 609 F.2d 1092, 1097 (4th Cir.1979); United States v. Interstate Dress Carriers, Inc., supra, 280 F.2d at 54; In re Doe, 537 F.Supp. 1038, 1041 (D.R.I.1982), just as if they had hired a storage company to warehouse them. It makes no difference that the appellants have no absolute right to the return of the property and do not even want the property back for its own sake but only so they can keep it out of the hands of an antagonist. Conceivably (if improbably) the government could keep their records forever without paying compensation, by analogy to cases like Hurtado v. United States, 410 U.S. 578, 588-89, 93 S.Ct. 1157, 1163-64, 35 L.Ed.2d 508 (1973), and Emery v. Oregon, 297 Or. 755, 688 P.2d 72 (1984); but see Robert Hawthorne, Inc. v. Director of Internal Revenue, 406 F.Supp. 1098, 1130 (E.D.Pa.1975); Application of Bendix Aviation Corp., 58 F.Supp. 953, 954 (S.D.N.Y.1945). But at the very least the appellants have a right to be heard on the disposition of their interests so that they can try to show, as they believe they can show, that the state does not have a legal right to take even temporary custody of all of the subpoenaed records. The analogy to the right to notice of persons having interests in property subject to an in rem proceeding, see, e.g., Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950), is transparent.
 
 
 14
 The fact that the state has not taken the records for "keeps," and will return them when it has finished its investigation, is also immaterial. Even a temporary deprivation entitles the property owner to due process--which means, as a general rule, to reasonable notice and an opportunity for a fair hearing. See North Georgia Finishing, Inc. v. Di-Chem, Inc., 419 U.S. 601, 606, 95 S.Ct. 719, 722, 42 L.Ed.2d 751 (1975); Sutton v. City of Milwaukee, 672 F.2d 644, 645 (7th Cir.1982). The appellants were not given these things. No emergency justified the district court in acting without notice to the appellants; and they ought at the very least to have had an opportunity, after the records were turned over to the state, for a hearing on their claim that the state was not entitled to inspect all of the subpoenaed records.
 
 
 15
 But when we turn to the question of the appropriate remedy for the district court's violation of the appellants' rights, we are driven rapidly to the conclusion that we ought not give them any in the unusual circumstances of this case. If the district court had given the appellants notice and an opportunity for a hearing, the result would not have been a denial of the requests in toto. The requested documents were not matters occurring before the grand jury and the appellants do not deny that the state is legally entitled to inspect most of them. At most the appellants might have been able to persuade the court that some of the records should be withheld. So if we ordered the district court to freeze the state's use of these documents pending a hearing on the state's request for the documents (the hearing the appellants were entitled to but never got), most of the records would be promptly unfrozen.
 
 
 16
 The appellants have alternative remedies against the state's unauthorized use of their records that are more direct and discriminating. They can challenge that use either in actions against the state or in defending against actions brought by the state against them; both sorts of suits are pending, we are told. There is no reason to try to resolve the dispute over the state's right of inspection in a hearing before a federal district judge who has no responsibility for resolving the underlying dispute between the state and the appellants, a dispute that the appellants acknowledge turns mainly on issues of state rather than federal law. When parallel federal and state suits are pending, the federal court should abstain if the state suit (here, suits) provides a distinctly more convenient and competent forum. See Microsoftware Computer Systems, Inc. v. Ontel Corp., 686 F.2d 531, 537-38 (7th Cir.1982).
 
 
 17
 It is true that when a federal court decides to abstain in favor of a parallel state proceeding, normally it should stay rather than dismiss the federal suit, so that the plaintiff is not deprived of a federal forum should the state proceeding not resolve the issue on which the federal suit was based. See Evans Transportation Co. v. Scullin Steel Co., 693 F.2d 715, 718 (7th Cir.1982). But as the appellants make no argument that they cannot obtain in the pending state proceedings (administrative and judicial) all the relief to which they are legally entitled, the difference between stay and dismissal seems academic; and in any event the difference has much more significance when a full-blooded lawsuit is dismissed than when a petition in a previously filed proceeding (the proceeding begun by the U.S. Attorney's motions for release of the appellants' record) is dismissed.
 
 
 18
 There is another ground for dismissing the appellants' petition. Their claim is equitable in nature; they want a mandatory injunction directing the return of the documents to the custody of the district court and an injunction against the state's making any use of the documents. Although many cases hold that an adequate remedy at state law is not a valid ground for refusing to issue a federal injunction, see, e.g., United States v. New York, 708 F.2d 92, 93 (2d Cir.1983) (per curiam), the proposition cannot be maintained in unqualified form, given Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), which, as we recently noted, rests on principles of equity jurisprudence, see W.C.M. Window Co. v. Bernardi, 730 F.2d 486, 490 (7th Cir.1984); and given the many cases, illustrated by Microsoftware, that allow a federal court to abstain in favor of a parallel state proceeding--even if, as in Microsoftware, the federal suit is not equitable, see 686 F.2d at 536. See also Rizzo v. Goode, 423 U.S. 362, 379, 96 S.Ct. 598, 608, 46 L.Ed.2d 561 (1976). There is still a sense in which equitable remedies are extraordinary, and may be withheld on broader grounds than legal remedies. See, e.g., Weinberger v. Romero-Barcelo, 456 U.S. 305, 311-13, 102 S.Ct. 1798, 1802-04, 72 L.Ed.2d 91 (1982). The existence of alternative remedies that appear fully adequate and more direct and economical, our reluctance to interfere with pending state judicial and administrative proceedings, and our more than suspicion that the appellants are trying to use this proceeding to "deep six" records to which (or at least to most of which) the state clearly is entitled, make this a fitting case in which to invoke the principle that equitable relief is extraordinary and to hold, therefore, that the judgment of the district court dismissing the appellants' petition for equitable relief should be, and it is,
 
 
 19
 AFFIRMED.
 
 
 20
 SWYGERT, Senior Circuit Judge, dissenting.
 
 
 21
 The majority holds that under the due process clause of the fifth amendment appellants should have been given notice and an opportunity to be heard before their records were turned over to the Illinois Department of Public Aid ("IDPA"). Notwithstanding the majority's decision that appellants were entitled to a predeprivation hearing, the majority concludes that "in the unusual circumstances of this case," ante at 580, appellants should be afforded no remedy. I agree with the majority that appellants' due process rights were violated; but because I believe that the majority's conclusion with respect to the proper remedy is without precedent or support in the law, I respectfully dissent.
 
 
 22
 Although the Supreme Court has not always applied a consistent analytical approach in all due process cases, see Comment, Procedural Due Process in Tax Collection: An Opportunity for a Prompt Postdeprivation Hearing, 44 U.Chi.L.Rev. 594, 596-603 (1977), the Court has never wavered from its position that once a deprivation of protected property has occurred some form of due process is required, see Logan v. Zimmerman Brush Co., 455 U.S. 422, 433, 102 S.Ct. 1148, 1156, 71 L.Ed.2d 265 (1982), whether it be a predeprivation or prompt postdeprivation hearing, or a subsequent suit for redress. See Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). This position is grounded in the Court's belief that the due process clauses of the fifth and fourteenth amendments protect each person from any arbitrary and unfair summary deprivations of protected property by the government. See Logan, 455 U.S. at 430, 102 S.Ct. at 1154. Thus in my judgment, the majority's view that it may refuse to grant some form of remedy when there is deprivation of property directly conflicts with clear Supreme Court precedent and with the very meaning of procedural due process.
 
 
 23
 Even if the majority were correct that in certain circumstances valid due process claims can be dismissed without remedy, I do not believe, as does the majority, that an extreme departure from established due process precedent is warranted in this case. The facts are neither extraordinary nor unique, and the reasons that the majority gives for affording no remedy can be applied to almost any due process violation. Even if it is not necessarily true that the majority's reasoning could be applied in all due process cases, I am not persuaded by the reasoning that the appellants should be afforded no remedy.
 
 
 24
 First, I am not as convinced as the majority that the IDPA is probably entitled to all of the documents that were turned over to them. As the majority points out, the IDPA's entitlement to the documents can only be determined by a resolution of state law. Without such a resolution, the majority's findings in this regard are pure conjecture. Moreover, the actual percentage of those documents that IDPA may be entitled to under state law is irrelevant. Some of the documents that IDPA improperly obtained may be confidential business records or particularly damaging to appellants for other reasons. Thus, the harm that may arise from the improper disclosure of one or two documents may be more than insignificant, see Sniadach v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969) (debtor entitled to pre-garnishment hearing even though total garnishment is only $31.59), particularly when viewed in light of the government's almost nonexistent need here for summary action. See Fuentes, 407 U.S. at 90-91, 92 S.Ct. at 1999-2000.
 
 
 25
 The majority also cites the appellants' ability to defend against the use of those documents by IDPA in state court proceedings as a justification for the failure to afford a remedy. I presume the majority is extrapolating from the reasoning of several Supreme Court decisions where the Court found that a party's due process rights were not violated when the party had adequate postdeprivation remedies. See, e.g., Parratt, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420; Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18; Mitchell v. W.T. Grant Co., 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974). An examination of those cases, however, shows that the majority's implicit application of the reasoning of those cases to the facts here cannot be sustained. In those cases where the Supreme Court has upheld postdeprivation remedies against constitutional attack, special circumstances existed. In some cases the Court found the opportunity for a subsequent suit for redress sufficient due process because there was a wartime emergency, Stoehr v. Wallace, 255 U.S. 239, 41 S.Ct. 293, 65 L.Ed. 604 (1921); a public health hazard, Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 679, 94 S.Ct. 2080, 2089, 40 L.Ed.2d 452 (1974); Ewing v. Mytinger & Casselberry, 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950); North American Cold Storage Co. v. City of Chicago, 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195 (1908), or it was impracticable or impossible for the state to provide a predeprivation hearing, Parratt, 451 U.S. at 527, 101 S.Ct. at 1908.[1]
 
 
 26
 In other cases the Court found prompt postdeprivation hearings satisfied the party's right to due process where a predeprivation hearing would have inadequately protected the rights of third parties who might have a valid interest in the property, see, e.g., Mitchell, 416 U.S. at 608-09, 94 S.Ct. at 1900-01, or where a predeprivation hearing would have imposed a substantial burden on the particular administrative agency charged with taking the property and providing the hearing, see Eldridge, 424 U.S. at 347-49, 96 S.Ct. at 908-10; Phillips v. Commissioner, 283 U.S. 589, 596, 51 S.Ct. 608, 611, 75 L.Ed. 1289 (1931). And in those cases the complaining party was at least given notice and a minimal opportunity to present additional evidence prior to the deprivations. Thus, there were safeguards against arbitrary decisionmaking.
 
 
 27
 The facts of the instant case are not even remotely similar to the facts of any of those cases. Here it was not impracticable to provide a predeprivation hearing; indeed such a hearing--albeit minimal--took place. No exigent circumstances were shown to exist. There was no gross administrative burden in requiring notice or a hearing. In fact some form of hearing before disclosure is required to determine if the documents are "matters occurring before the grand jury" or if the documents can be disclosed pursuant to one of the exceptions to Fed.R.Crim.P. 6(e). Finally there is nothing in the procedures followed here that would deter a federal court from perfunctorily turning over to any state agency that files a request with the United States Attorney grand jury documents to which that state agency may or may not be entitled. That danger is clearly evidenced in this case where the orders to disclose were made the same day that the United States Attorney filed the ex parte motion for disclosure based upon the information provided to him by the IDPA.
 
 
 28
 In addition, in all of those cases the Supreme Court placed considerable emphasis on the fact that the complaining party could be made whole by the postdeprivation procedures. See, e.g., Logan, 455 U.S. at 422, 102 S.Ct. at 1148; Brown v. Brienen, 722 F.2d 360, 367 (7th Cir.1983) (Flaum, J., concurring). In the instant case it is not clear that appellants will be made whole by an ability to defend against the use of those documents against them. The IDPA has taken control of numerous business records, some of which may be irrelevant to its functions. It is possible that without appellants' permission the IDPA could turn over copies of some of the documents to any other person or state agency--such as the state revenue service--who could start their own investigations or instigate other civil proceedings against the appellants. Although Fed.R.Crim.P. 6(e)(3)(B) imposes limitations on the use a party can make of documents obtained from the grand jury, IDPA is not subject to those limitations because it did not obtain the appellants' records pursuant to a disclosure request under Fed.R.Crim.P. 6(e)(3)(A). Moreover, it may also be that the IDPA, or another agency privy to those records, may be able to successfully prosecute or harass appellants based on knowledge obtained from the records but without ever having to directly use those documents in litigation. Thus, although the situations I have posited will not necessarily occur, they show the real possibility of an irreparable harm which cannot be remedied by hypothetical state court procedures.
 
 
 29
 Furthermore, the Supreme Court in all of the cases cited clearly contemplated established plenary postdeprivation procedures which the injured party could invoke immediately after the deprivation has occurred. See Comment, supra, 44 U.Chi.L.Rev. at 601. In the instant case, there are no established state court procedures which would afford appellants immediate redress; in addition, the IDPA has sole control over when those procedures will be invoked. Although it is true that some proceedings are already in progress, the IDPA is not prohibited from bringing further investigations or civil proceedings based on the information in the documents. Thus appellants' "remedy" for its due process claims is solely within the IDPA's discretion.
 
 
 30
 Finally, the analysis in Parratt, Fuentes, and Paul v. Davis, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), makes clear that the state's taking of a party's property does not violate the due process clause when the state provides adequate postdeprivation remedies. In the instant case the majority is suggesting that a deprivation of property by the federal government may be remedied by adequate state court procedures. In my view this suggestion is illogical as a matter of remedies law and is untenable in our federalist system. Moreover, no court to my knowledge has extended the reasoning of Parratt that far.
 
 
 31
 The majority is also swayed by the fact that essentially only issues of state law are involved in a determination whether all or only some of the appellants' records should be disclosed. But this is not a case in which we run the danger of a wholesale constitutionalization of state tort law, see Parratt, 451 U.S. at 544, 101 S.Ct. at 1917; Paul, 424 U.S. at 712, 96 S.Ct. at 1165; or state employment law, see Vail, 706 F.2d at 1449 (Posner, J., dissenting), or any other state law, thereby depriving state courts of their proper jurisdiction over these matters. The district judge here, once having made the determination that the documents were not matters occurring before the grand jury, could stay the request for disclosure until the parties repaired to the state court to resolve their differences over the state law questions. But, even if the district judge is required to decide issues of state law, this minor isolated encroachment on the principles of federalism is mandated by the due process clause.
 
 
 32
 Finally it is of no moment that the appellants may be attempting to "freeze" the documents in the grand jury. As Judge Posner admits, the business records remain the appellants' property and "[i]t makes no difference that the appellants do not want the property back for its own sake but only in order to keep it out of the hands of an antagonist, ...." Ante at 580. Indeed, the instant case is very similar to those in which the Supreme Court suggested that a predeprivation hearing is required notwithstanding the fact that the injured party may have been invoking the due process clause to delay a third party from ultimately taking property of the debtor to which the third party may be entitled. North Georgia Finishing Co. v. Di-Chem, Inc., 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975); Fuentes, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556; Sniadach, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349. But see Mitchell, 416 U.S. at 618-20, 94 S.Ct. at 1905-06. In all of those cases the Court invalidated summary ex parte proceedings and held that the complaining party was entitled to show that the other party should not be able to take possession of the property. Moreover, given that the majority here has determined that appellants' documents are not matters occurring before the grand jury or subject to the rule for secrecy and the majority's conviction that the IDPA is actually entitled to these documents, I am at a loss to see how permitting the appellants an opportunity to present their case would "freeze" these documents in the grand jury.
 
 
 33
 Even if the "clean hands" doctrine is applicable in the due process context (and I doubt that it is), I think there is a sense in which all parties were guilty of unclean hands. The IDPA could have tried to compel the appellants themselves to obtain the documents from the grand jury and then turn them over to that agency by threatening to cut or actually cutting off appellants' participation in Medicaid. Or, as the majority notes, the state agency itself could have petitioned for disclosure of the grand jury documents in which case Fed.R.Crim.P. 6(e) would have required that notice be given the appellants; moreover, the state agency deliberately chose to invoke the unauthorized but more expedient and presumably less cumbersome ex parte powers of the United States Attorney. In my view, even if plaintiffs were guilty of flagrant and egregious Medicaid violations and intend to fight tooth and nail the imposition of any civil sanctions, this does not justify the state and federal government acting in concert to unconstitutionally deprive appellants of their property. At a minimum, some remedy is required to deter any further attempts to employ the clearly improper procedures followed here. As I have already stated, the facts here are not extraordinary, and the decision of the majority is likely to encourage state agencies or other parties to use the ex parte procedure employed in this case with the hope that the courts will once again relegate injured parties to hypothetical and inadequate state court procedures. The majority's decision in effect grants these third parties summary seizure powers that they do not otherwise possess.
 
 
 34
 I admit that this is an unsympathetic case in which to impose the substantial burden on the state agency and the federal district court of prohibiting the use of the documents by the state agency during the pendency of a hearing in which appellants are entitled to participate. In addition, as the majority points out, it is extremely inefficient and perhaps futile to require the state agency to pretend as if they have never seen or reviewed the documents in their possession for almost a year. But "bad" facts should not lead to "bad law." Fundamental rights to due process are involved here. Harmless error however disguised or seemingly justified ought not slacken the taut line linking proper procedure to the demands of due process.
 
 
 
 *
 Hon. Franklin T. Dupree, Jr. of the Eastern District of North Carolina, sitting by designation
 
 
 [1]
 Although there is some debate over whether Parratt held that postdeprivation remedies are always adequate due process, see Vail v. Board of Education of Paris Union School Dist. No. 95, 706 F.2d 1435 (7th Cir.1983) (Eschbach, J., concurring, Posner, J., dissenting), aff'd, --- U.S. ----, 104 S.Ct. 2144, 80 L.Ed.2d 377 (1984), the Court in Logan v. Zimmerman Brush Co., 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982), made clear that Parratt was confined to situations in which it was impracticable, if not impossible, for the state to provide predeprivation remedies. See also Schultz v. Baumgart, 738 F.2d 231, 237 n. 9 (7th Cir.1984). Cf. Hudson v. Palmer, --- U.S. ----, 104 S.Ct. 3194, 3202-03, 82 L.Ed.2d 393 (1984)